up our normal business today, I'll turn to Judge Moore for a motion. Ingie, please stand up. I move the admission of Ingie Osmond, who's a member of the Bar and is in good standing with the highest court of Virginia. I have knowledge of her credentials and am satisfied she possesses the necessary qualifications. On a personal matter, I'll say Ingie's been my law clerk for about 18 months and she's possibly one of the sweetest yet most ferocious lawyers that I've had. She killed everybody with kindness, which is part of how she's so effective, but she's an incredibly bright girl, she's become an amazing writer, and I know that she'll be a real asset to our Federal Circuit Bar. So I'm happy to move her admission and hope I've made a good case for my colleagues to accept her. Not much need because I've had the pleasure of also getting to know Ingie over the time she's been with you, Judge Moore, and I would second that. She's a delightful person and a wonderful lawyer, and we wish her all of the best. Our first case for argument this morning is 14-1162 Ingray Roth. Mr. Cumberton. Thank you, Your Honor. May it please the Court, the Board's conclusion of obviousness in this case should be reversed for several reasons. If I may, I'd like to address part of the case that I find particularly disturbing, and that is the PTO's mischaracterizations of the references in order to support the combination of the 795 patent and Ludwig. The rationale appears at A666-A667 and if you look at the rationale, it's very general. It refers to the references very generally. The references are not that general. In particular, the 795 patent only discloses surface treatments. It is specifically and purposely limited to surface treatments. Well, that's true, but this is an obviousness rejection, and it's a combination of other pieces of prior art that use the injection. Understood. My objection to the PTO's analysis in the case is it doesn't appear that they have addressed the differences as they must do between the claimed subject matter and the prior art. This is just an example. The other thing about the 795 patent is it specifically teaches that it's desirable to limit the contact time between the treatment material and the meat in order to prevent damaging the meat. That's a specific disclosure in that reference. By the way, a person of ordinary skill in the art looking at the 795 patent would recognize why it's limited to surface treatments. The bacteria that's described in that reference are at least at that time were bacteria that were thought to be only a problem at the surface of the meat. So the treatment is limited to the surface, so that would be apparent to someone of ordinary skill in the art. Now, the Ludwig patent, if you look at the rationale for rejection, it describes this very generally. It describes this as it discloses injecting antibacterial material. It does disclose that, however, it discloses a specific antibacterial material, and that's sodium citrate, which is a vastly different material than ammonium hydroxide, which is in our class. Sodium citrate is odorless. Ammonium hydroxide has a very strong odor, as we all know. Sodium citrate is salty tasting, mildly tart. It's a known flavorant, so it's not truly surprising that that would be appropriate to inject into the interior of a piece of meat. There are a couple of other points where I consider either just incorrect factual findings or at least misstatements. At the bottom of A668, this is an important point, Roth, the 795 patent, also discloses it is desirable for the pH increase in material to be absorbed into the meat product and affect a desired pH increase. It does disclose that very clearly. That's a quote from the reference. What they neglect to point out is in that same column above, it defines what a desired pH increase is, and it is a pH increase at the surface, up at lines 11 and 12 of that same column. The operating period is a period sufficient to raise the pH at the surface of the meat product to a desired level, at the surface to a desired level. There's another important point here, I think, that shows up at A667, in the middle of that page, referring to Roth, excuse me, I keep on calling it Roth, it's the 795 patent, there are too many Roths, the 795 patent as suggesting that it would be desirable to achieve deeper penetration of the antibacterial agent into the meat. The quote is, one of ordinary skill in the art would have been motivated to employ injecting of antibacterial solution in order to achieve deeper penetration of the antibacterial agent into the meat interior. It's referring to the Roth, the 795 patent, as suggesting that for the 795 patent specifically, is a surface treatment patent exclusively, surface treatment, and not only that, says where the pH increase is supposed to be at the surface, and also suggests you have to limit the contact time. The problem with the combination of injecting the ammonia, the surface treatment material, from the 795 patent with Ludwig, is that... Are you suggesting that all of this is a teach away? You're right, they inquire, you know, Roth increases the short operating time, but it also teaches increasing the exposure time to achieve the desired modification. So, there's stuff going back and forth, and I'm not sure how far what you're pointing to here gets you. I think you can look at it as a teach away argument. Maybe this is... It really goes to... The rationale for combining these references goes to predictable results. Were the results predictable? After all, what we're trying to do is we're trying to put ourselves in the position of a person of ordinary skill in the art, and at that time, would they have found it obvious to inject this ammonia treatment material knowing that Roth suggests that you have to limit contact time to avoid damaging the meat? I know that the references you're referring to about longer operating time, but I don't think those in that reference somehow trump the disclosure that you need to limit the treatment damaging the meat. Regardless of what else you do, that statement is there. And I think a person of ordinary skill in the art would not find it obvious to apply this ammonia in a way in which you cannot control the contact time, which is injecting it into the interior. Once it's there, it's there. But also, there's more, even in the prior art, there's more that suggests that it would not be appropriate to apply ammonia in a way in which you cannot control the contact time. And that's the Heinz reference, which is at A533. This patent at column 2 lines, starting around line 10, they refer to the necessity or the fact that near the maximum treatment times, and in this case it's a few minutes, at atmospheric pressure near the maximum contact times, it leaves the meat with an ammonia odor. The examples down here, example 1, the treatment time was 30 seconds and nine days later, after this treatment, they detected an ammonia odor. That suggests, if simply applying it to the surface produces this odor, I think that suggests that it would not be appropriate, especially the teaching that you have to limit the contact time. Is there anything in the 419 application that talks about the unexpected result or the newness of eliminating the odor that suggests that eliminating the odor was a problem and the purpose of this? No, as the problem, no. Not that I recall. The problem was Isn't that surprising given that the thrust of your argument here is that there's a real unexpected result and that's that one would have assumed that there would be odor and therefore would have been motivated against not to try this. Well, again, I don't think that the fact that that's not necessarily in the patent disclosure trumps the rest of the evidence that suggests that it would not be expected. Going on from the prior art itself, we have objective evidence from Dr. Dixon and Dr. Morgan. Dr. Dixon's evidence is particularly interesting because he was he was familiar with the 795 patent and treating ammonia with treating ground meat, comminuted meat, with ammonia and knew from that experience that that had to be limited to prevent the ammonia odor. In fact, the 795 patent is all about increasing the pressure to reduce the contact time and prevent the material from damaging the meat. Dr. Dixon, after having that experience, expressed his surprise when the inventor, Mr. Roth, suggested that he wanted to inject ammonia directly into the interior. The reason he was surprised was for two reasons. One is he felt that it would almost certainly leave the meat with an ammonia odor and damaged for that reason, but also the types of bacteria that were addressed, that they were going for, that they were trying to control and didn't control quite effectively in the process disclosed in the 795 patent, were at that time not thought to be a problem in the interior of the meat. So he thought it was novel, I think that's the term that he used in his declaration, quite novel to inject this material that was full of surface bacteria into the interior where that bacteria is not found. He couldn't think of a reason to do that, especially since he felt it would damage the meat. So we have this objective evidence of unexpected results as well. As far as the unexpected results, we have evidence from Dr. Morgan, who is an expert in organoleptic testing, who conducted tests of this injected material for organoleptic properties, including off odors and ammonia, and they found that there were none. So these results, these are the results of injecting this. It did not produce the odor, which was unexpected. Does the 795 say anything about odor anywhere? It does in referring to the tests toward the end of the patent. Because I understand it says reducing the time to avoid some undesirable results with regard to the texture of the meat, but I didn't see it refer to odor. It's back in the examples. Example number one, column 11 maybe. Yes, in column 11. But there is the NH3 product contained no detectable NH3 aroma either while thawing, during cooking, or after being cooked. And it didn't affect the taste. And this is after a surface treatment, it was designed not to do that. So again, the issue is the prior art suggests that it would not be appropriate to apply this ammonium hydroxide material in a way in which you cannot control the contact time, and that's what is claimed in our claims here, in the interior. Your interior rebuttal time, so you want to save the rest of it? I will do that. Thank you. You may please report. Claim one that is sought here is simply a concept to the idea of taking the known antibacterial treatment for surface absorption in meat and applying it deeper into the meat using known injection techniques for delivering antibacterials. The obviousness case here is not based on a mischaracterization of the references. Roth's own prior art 795 patent teaches surface treatment, but most importantly surface absorption. That is a more discreet and important fact finding made by the examiner here. But if one expected that the injection treatment would lead to an offensive odor, then wouldn't that be a factor in terms of whatever motivation there existed to combine? Well, your earlier question too, by the way, was just a teaching away. Remember, there's also a prior appeal from a I'll use the word related, it has the same specification in similar claims, namely the direct injection of ammonium hydroxide into meat. And frankly, no matter how it's couched, it runs into the fundamental problem that Roth's own prior art patent teaches that when he applies the ammonium hydroxide to the surface, it has to get into the meat. Absorption means penetration. And in fact, his own disclosure here in the underlying application at A26 confirms this much. He says the systems and methods set out in the above described patents, this is line 3 on A26, the systems and methods set out in the above described patents, including his 795 prior art patent, are effective for modifying the pH at the surface of the meat product and somewhat below the surface. It's getting into the meat, the interior of the meat. Do you ever marinate meat, Yuka? I do, not well. But if you marinate meat for an hour, you've got largely surface coverage and maybe a tiny bit of penetration. But if you marinate meat overnight, the meat all the way through, depending on how thick the meat is and how much vinegar acidity is in the product, will likely be marinated all the way through. What this patent consistently teaches throughout is using a short period of time, whether it be because of odor or texture, that ammonia, like I have to say, the first thing I thought of is, oh my gosh, I'm so glad I only feed my children organic meat that doesn't have preservatives. Because the idea of somebody injecting ammonia, that's what you put in your floor to clean the tile when awful things have happened to it. Wow, that's what you're injecting into the meat? My immediate reaction was, holy cow, why would anyone ever consider injecting ammonia into meat? That doesn't seem obvious to me. And in fact, when I read the 795 patent, what I came away with was the understanding that some tiny bit of absorption in order to change the pH to maintain the color. Because you've probably also gone to the store like I have, and sometimes the meat is pink and sometimes it looks brown. And you know, pink meat probably is just as old as the brown meat. It was just injected with this stuff. Or exposed to oxygen. Right, but you understand the point I'm making. So the point I'm making is that this patent, as I read it, really is all about short-term minimized exposure in order to increase the pH so that you don't affect  the pH that will act as an antibacterial process. There's a couple of things. That's a lot, I'm sorry. That's okay. So you're correct that the pH modification surface absorption treatment in Roth's prior patent is at some level directed to the texture color. But it's very clear in the Roth 795 patent why they're seeking to modify the pH, and it is for that antibacterial activity. For example, the abstract on A100 says, quote, well, five lines down, the increased pH reduces bacterial activity. So Artisans knew that you could use ammonium hydroxide, or ammonium, in this case. In the 795 patent, he delivers the ammonium to the surface, it gets absorbed, where ammonium hydroxide is formed, the free radicals affect the pH reduction and the antibacterial result. So sort of to go back to your initial knee-jerk reaction, why is anyone using ammonium hydroxide on meat? Frankly, I would have thought that that knee-jerk reaction would apply as well to the surface treatment. Because invariably, some of it is getting in there, and it's not going anywhere. And we know that because not only does he teach that it is absolutely necessary for that ammonium hydroxide to get into the meat. You know what, but I put perfume on my skin sometimes. Actually, I don't. But people put perfume on their skin to make themselves smell better. But there's a difference between putting it on your skin, where no doubt it's absorbed into the epidermis, the top layer of the skin, and injecting it into your veins. Do you see the difference? I mean, clearly that perfume on the skin may not be poisonous or treacherous, but once injected, it seems like it's a whole different animal. So the second thing I wanted to point out is, leaving aside the necessity of the 795 prior art patent and Roth's patent of absorbing it into the meat, with respect to contact time, it's not as categorically absolute about avoiding increased contact time as Roth would have us believe. He says, for example, on column 2, A109, column 2, starting about line 11, he says, quote, the operating period is a period sufficient to raise the pH at the surface of the meat product to a desired level, and may be a very short period of time in the order of seconds, or fractions of seconds, or may be longer, depending primarily upon the treatment pressure. And later on in his particular disclosure, this is at A113, column 9, starting line 32, operating or neutralizing pressures at near atmospheric pressure provides significant pH effect. However, the lower operating pressures require longer operating periods to produce a given pH modification. A pH modification achieved only by absorbing the material into the meat. So once artisans understood that you could use ammonium hydroxide to affect these pH changes to get the antibacterial properties and had a reason to want to affect that result inside the meat, the question becomes, how do I deliver the antibacterial to the meat? And the answer is Ludwig. Artisans understood that you could deliver antibacterial to the interior of meat to achieve antibacterial properties. And what's noticeable about Ludwig, we heard a little bit about Ludwig's particular antibacterial, sodium citrate. It's true, this is not a 102 rejection. Ludwig was not injecting ammonium hydroxide into meat. But we also can't ignore that Ludwig's sodium citrate had its own potential negative consequences. Yet Ludwig was injecting, Ludwig is from 1995. Ludwig in 1995 was injecting his sodium citrate into meat and he understood, I understand that, I'm talking as if I'm Ludwig, Ludwig says that column 2, line A171, column 2, line 16. The sodium citrate solution is preferably injected at a solution concentration of sodium citrate which will not denature meat protein. I.e., I recognize sodium citrate has some potential negative consequences. I'm still injecting it because I want the antibacterial result. And I know how to avoid those potential negative consequences by controlling things such as concentration. The Heinz reference, which is not actually part of the obviousness rejection, but that Roth has relied on in his briefing to this court, as yet another example of warning against using ammonium hydroxide with meat, Heinz applied ammonium hydroxide to the surface and he recognized the potential consequences of using too much. But what's telling about Heinz, first of all, at A533, column 2, line 11, he says, near the maximum times there's a tendency for the meat to retain a distinct but not unpleasant odor of ammonia, even for several days. And he goes on to say below that the ammonium odor is actually not dangerous, but to the extent you want to avoid it, you control your concentration. That's on the surface. That's correct. But the reason why it's pertinent, Your Honor, to the argument that Mr. Roth is making is this idea that there's this discord between the third rail theme of his, you would never inject ammonium hydroxide. You wouldn't even think about it. Tellingly, his experts, when they say I just assumed that if you put any amount of ammonium hydroxide into meat at any depth because, remember, claim one is not limited to a particular amount and it is not limited to a particular depth. Their theory is, I don't care how much, I don't care how deep, you've got a piece of meat that you cannot use. It doesn't bear out. Artisans were injecting antibacterials with known negative consequences well before Roth filed this patent application. But everything in Roth, which is your primary reference, the 795, is about limited time. You read us two passages, one I think from Column 2, about how it could be seconds or maybe longer. Well, longer than seconds doesn't apply injecting it so it stays in permanently. It still implies some sort of duration of exposure. And then the Column 9, I think you read from, but everything, every example, I mean the longest example is exposure for two to two and a half minutes and it all depends on the amount of pressure, I guess, right? I think that's particularly saying they're sort of looking for offsetting variables. Lower pressure, longer time. But I think what's telling is... But every example and throughout this entire patent, the whole notion seems to be limited exposure. You want some absorption, enough to change the pH, but you don't want it on there because it will affect the odor, it will affect the texture, it's not good to have it permanently in there, even though there's some absorption. And that, I don't know, that makes sense to me, but that seems far, far different from inject the meat with it so that it's there forever in its full concentration. Well, again, this claim is not limited to a particular amount, a particular concentration, a particular depth, any of these things. It simply takes... That's sort of what, I don't want to say sort of, just thinking about it logically. There's a discord between his claim and the way he's claimed his invention. If artisans were so convinced that no matter how much ammonium hydroxide you injected into meat, you would end up with an unusable piece of meat, then that is based on an assumption. If you look at Morgan and Dixon, they say, I just assumed that if you put ammonium hydroxide into meat, you would have an unusable piece of meat. It's not based on any data. Nobody tried to inject it in the past and said, this thing is unusable, we cannot do this, we shouldn't do this, you don't want to do it. It's just an assumption. So either that assumption was wrong, because claim one simply injects ammonium hydroxide into meat with absolutely no variable controls, or Roth found a solution to a problem that artisans figured was unnecessarily avoidable, but he has not claimed it. Because if it was so true that artisans were convinced that no matter how much ammonium hydroxide you injected into meat, you would have an unusable piece of meat, then it's clear that there has to be some solution to that problem. And claim one just simply says inject ammonium hydroxide into meat. Artisans understood that you could put antibacterials with antibacterials having no negative consequences by injecting it directly into meat. Once artisans had a desire to take the known antibacterial ammonium hydroxide and inject it into meat, they would have looked at Ludwig who was doing the same thing for a different antibacterial to arrive at claim one. That is all claim one says. So if claim one was a particular concentration and it was discovered by Mr. Roth that this concentration if injected would appropriately raise the pH, but not otherwise result in those negative side effects for odor, weird color, texture problems, then you think that might be a different story? It might be a different I mean it's difficult to say because a lot of it would depend on the nexus between his unexpected results evidence and the claim at issue there and the particular limitations that were in it. But for the purposes of this case, this claim has no limitations other than having a needle in ammonium hydroxide in a piece of meat. This is what the board was saying at A4 to A6 and A7 when it said your unexpected results theory suffers from, among other things, a lack of proof. We don't know. There's nothing in this record other than the assumption of your experts that meat treated with ammonium hydroxide would result with an unusable piece of meat for odor. And in fact, per your question Judge Moore, the only evidence that we actually have is that the... It's not that it would result in an unusable piece of meat, it's that would it have been obvious to one of skilled CR at the time to take this ammonium solution that is otherwise on the surface and use the Ludwig injection process to inject it into the surface? And the question is, would it have been obvious or would one of skilled CRs have said, let me see, let me read Ross here, which teaches away from long-term exposure. The longest exposure is two and a half minutes disclosed in Ross. And there are all kinds of reasons why limited exposure is articulated in Ross. Texture, odor, whatever, color. Would somebody skilled CR have said, nonetheless, let's inject it? No. Because, and this is what the board said at A4 to A5... Oh, I'm sorry, yes. Yes, we want it to be obvious. At A4, the board said that this repeated focus on exposure of surfaces to meat with the ammonium hydroxide and not the interior, and this argument that one would have expected ammonium hydroxide and interior would have damaged the meat, failed to consider the prior art as a whole. And I've said it, but it's worth repeating. Ludwig was injecting antibacterials into meat, and Langan, which is also an injection... Yes, but Ludwig was injecting antibacterials that didn't have any of the negative consequences of ammonia. And so... Well, that's, Your Honor, with due respect, I don't think that's accurate. I mean, Ludwig makes clear that his sodium citrate has potentially negative consequences. At A171, column 2, line 16, the sodium citrate solution is preferably injected at a sodium concentration, a solution concentration of sodium citrate, which will not denature meat protein. My sodium citrate solution, I don't care about, but I'm still using it, and I'm still injecting it directly into meat. And part of the reason I know I can get away with that is because I can control the amount. So it's very clear on this record from the cited references that artisans understood that you could inject antibacterials, even ones with known quantifiable concerns. And even here, I mean, artisans, this is what the examiner said and it was quoted by the board at A7. Artisans were using sodium hydroxide to treat meat, fully aware of their negative consequences. And those consequences, the odor, whatever, don't change simply because you're injecting them in some deeper depth than your surface absorption is. So given all of that evidence, which is supported by the record, the board's conclusion that this claim is obvious should be affirmed. Thank you. I think that we've covered everything here. I just want to go back and there are a couple things that I wanted to mention. In terms of the objective evidence, I believe there's an error in the way the board addressed the objective into the unexpected results. Over at A5, they refer to the thought having to establish that the difference between the claimed invention and the closest prior art was an unexpected difference. That misstates the precedent. The precedent refers to the results of the claimed, comparing, not comparing, but the difference between the results of the claimed invention and the results of the prior art. I think that's just an incorrect statement of the law and to the extent they use that to find that their conclusion was specifically no showing of unexpected results, I think that's an error as a matter of law. Going back a little bit to the objective evidence and also the obviousness, this is interesting because the objective evidence has a direct impact, a direct bearing on the rationale used to combine the references. If it was unexpected, how can you say it was predictable? In other words,  I see my time is up, so I should stop right now. I respectfully request that the court reverse the PTO finding of the obviousness in this case. Thank you. Thank you. We thank both counsel. The case is submitted and we'll take a brief recess. All rise. ... ... ... ...